**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GEORGE R. SCHNEIDER, Plaintiff, v. MICHAEL J. ASTRUE, Commissioner of Social Security, Defendant. | ) | Civil Action No. 08-256 Erie |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

Plaintiff, George R. Schneider, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. Plaintiff filed an application for DIB on July 11, 2005, alleging disability since May 4, 2001, due to diabetes, a fractured left hip, difficulty reading and alcoholism (Administrative Record, hereinafter "AR", 76-80; 92; 118). His application was denied, and he requested a hearing before an administrative law judge ("ALJ") (AR 49-50; 61; 63-67). Following a hearing held on September 13, 2007, the ALJ found that Plaintiff was not entitled to a period of disability or disability insurance under the Act (AR 20-43; 365-407). His request for review by the Appeals Council was denied (AR 6-12), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, the Plaintiff's motion will be denied and the Defendant's motion will be granted.

## I. BACKGROUND

Plaintiff was born on May 29, 1952, and was 48 years old at the time of his alleged onset date and 55 years old on the date of the ALJ's decision (AR 76). At all times relevant to this case, he was an individual closely approaching advanced age within the meaning of 20 C.F.R. § 404.1563. Plaintiff did not finish high school, only attending through the 9th grade, but denied attending any special education classes (AR 97; 372). His past relevant work experience was as

a press operator, fork lift operator and pallet maker (AR 41). He has not engaged in substantial gainful activity since May 4, 2001 (AR 372).

Plaintiff has a history of treatment for diabetes, vision problems and complaints of hip pain.[1] Early medical records show that Plaintiff was seen by George Vukmer, M.D., an ophthalmologist in August 2000 for a retinal check up (AR 165). Dr. Vukmer reported that Plaintiff's vision acuity seemed better and his visual acuity at that time was 20/30 in one eye and 20/50 in the other eye (AR 165). An eye examination in February 2001 revealed continued improvement and Dr. Vukmer found his visual acuity at that time was 20/25 in one eye and 20/40 in the other, and his peripheral vision was normal (AR 164). It was noted that Plaintiff had 20/20 vision with correction (AR 164).

In January 2002, Plaintiff was seen by Christopher Adsit, an optometrist, for complaints of blurry vision (AR 158-159). His visual acuity was 20/25 in the right eye and 20/60 in the left eye (AR 158-159). Dr. Adsit found his pupil examination was normal, as were his extraocular muscles and confrontation fields, and his color vision was intact (AR 158-159). Slit lamp examination showed some abnormal lenses bilaterally, but the remaining findings were normal (AR 23). Fundus examination showed some abnormality of the left optic nerve (AR 158-159). No diabetic retinopathy was reported (AR 158-159). Plaintiff did not return to Dr. Adsit until January 2003, and his vision examination was essentially unchanged (AR 154-157). Visual acuity was reported as 20/45 in the right eye and 20/65 in the left, and Plaintiff was prescribed corrective lenses (AR 154-157).

Plaintiff was also treated by Jeffrey Caldwell, M.D., beginning in January 2003. Dr. Caldwell noted that Plaintiff had a history of diabetes, but did not follow a special diet or exercise regimen (AR 197). Other than complaints of heartburn, Plaintiff had no other complaints (AR 197). Physical examination was normal and he was continued on the same medication with instructions to stop smoking (AR 197). Throughout 2003, the severity of the Plaintiff's diabetic condition fluctuated dependant upon his compliance with his prescribed medication regimen (AR 193-197; 212). His physical examinations remained essentially normal

[1]Since the ALJ's decision contains a comprehensive discussion of the Plaintiff's medical history, only the details necessary to address the Plaintiff's arguments shall be set forth herein.

throughout the year (AR 193-197; 212).

When seen by Dr. Caldwell in January 2004, Plaintiff's physical examination was reported as normal and he was encouraged to abstain from alcohol (AR 191). In May 2004, Plaintiff's physical examination was normal, but lab results showed poor diabetic control (AR 190). Plaintiff was instructed on his diet and his medication was increased (AR 28).

Plaintiff was referred to Ann LaRochelle, M.D., a diabetic specialist in May 2004 (AR 257). Plaintiff reported that he had corneal implants, but had no musculoskeletal complaints or functional limitations (AR 28). Dr. LaRochelle adjusted his medication regimen, and subsequent lab results showed improvement in his diabetic condition (AR 257).

Plaintiff also returned to Dr. Adsit in May 2004 who found some optic disc edema, but attributed it to Plaintiff's elevated blood sugars (AR 152; 322). Dr. Adsit found no need for ocular treatment at that time, but noted that Plaintiff needed aggressive treatment for better diabetic control (AR 152;322).

When seen by Dr. LaRochelle in June 2004, Plaintiff reported feeling "shaky" and suffering from frequent episodes of hypoglycemia (AR 252-254). He acknowledged, however, that he did not test his blood sugar regularly (AR 252-254). Plaintiff also reported suffering from diabetic retinopathy and nocturia (AR 252-254). Dr. LaRochelle's reported findings on physical examination were unremarkable, with the exception of bilateral neuropathy in his feet (AR 252-254). Plaintiff was also seen at the Mind Body Wellness Center for diabetic education wherein he received instruction regarding lifestyle changes in order to manage his diabetes (AR 160). He was scheduled for a more in-depth meal planning appointment and encouraged to attend monthly support groups (AR 160).

Follow up notes from Dr. LaRochelle in July 2004 noted that Plaintiff's diabetic control was slipping and his medication regimen was changed, and by August laboratory studies showed some improvement (AR 251). Dr. Vukmer's progress notes from August 2004 showed that Plaintiff's visual acuity had improved, with prior reported blurriness attributed to his elevated blood sugars (AR 163; 316). Eye examination revealed visual acuity was 20/40 in one eye and 20/50 in the other eye, and there were no abnormalities noted (AR 163; 316). Dr. Vukmer noted the Plaintiff's "lousy self care" and he was again counseled and instructed to quit smoking (AR

163; 316).

Plaintiff returned to Dr. LaRochelle in October 2004, who noted that Plaintiff probably needed insulin (AR 249). In November 2004 Dr. LaRochelle's physical examination showed some numbness in the Plaintiff's feet, but there were no ulcers or pain (AR 248). Plaintiff refused to start insulin and Dr. LaRochelle continued his medications (AR 248).

When seen by Dr. Vukmer in December 2004, Plaintiff had no complaints, and his examination was unchanged from the previous visit (AR 162). Plaintiff was again instructed to take better self care (AR 162).

Plaintiff sought treatment in the emergency room in January 2005 as a result of his hand shaking and a "few seconds" of unresponsiveness (AR 169-170). Plaintiff reported a history of headaches, diabetes and stomach problems (AR 169-170). Plaintiff denied suffering from any shortness of breath, weakness or numbness in any area, vision changes or neurological symptoms (AR 169-170). Physical examination was normal and Plaintiff's lab studies were normal except for a slightly elevated glucose level and an elevated Prolactin level (AR 169-170). He was given Ativan and discharged in good condition (AR 169-170).

When seen by Dr. Caldwell in February 2005, physical examination revealed some tenderness in the liver and spleen area, as well as a hernia (AR 188). No other complaints were noted and his station and gait were normal (AR 188).

Plaintiff was also seen by Dr. LaRochelle in February 2005, who noted that his blood sugar readings were elevated and that while he generally followed his prescribed meal plan, he did not exercise and rarely monitored his blood sugar levels (AR 247). Plaintiff again refused to start insulin despite Dr. LaRochelle's recommendation that he do so (AR 247). In April 2005 Plaintiff complained of hyperglycemic and hypoglycemic episodes (AR 247). Plaintiff was instructed on the use of insulin and was able to give himself injections (AR 246). He was directed to check and document his blood sugar levels (AR 247). At his follow up appointment with Dr. LaRochelle in May 2005, Plaintiff reported that he was following the prescribed diet and checking his blood sugar regularly (AR 243). He denied any diabetic associated symptoms, and Dr. LaRochelle noted on his lab studies that he was doing better (AR 243; 278). She adjusted his medication regimen and further improvement was noted on lab studies in August

(AR 278).

Plaintiff began treatment with the Conneaut Valley Health Center in August 2005. Plaintiff reported to Frank McLaughlin, D.O., a history of diabetes, left hip "rash", hearing loss, a hernia and cataracts (AR 172). No musculoskeletal complaints were noted, and his physical examination was normal, with reported muscle strength of 5/5 in both the upper and lower extremities (AR 172).

When seen by Dr. LaRochelle in September 2005, Plaintiff reported that he had "hip problems" and was seeking disability (AR 240). Dr. LaRochelle noted some retinopathy and neuropathy, but found his diabetes was "much better" (AR 240). She continued his medication regimen (AR 240). In September 2005, Dr. Caldwell completed a medical form stating that the Plaintiff's station and gait were normal and that he did not use an assistive device for ambulation (AR 187).

Pursuant to the request of the Commissioner, Plaintiff underwent a consultative examination on October 25, 2005 performed by John Kalata, D.O. (AR 217-221). Plaintiff reported a history of diabetes, a fractured hip, alcoholism and trouble reading (AR 217). Dr. Kalata noted that he walked with a limping type of a gait (AR 217). Plaintiff denied any hip surgery, but stated that he underwent therapy for the pain (AR 217). He stated that he stopped drinking four years prior (AR 217). He claimed he was in special education classes in high school (AR 217). On physical examination, Dr. Kalata reported that Plaintiff's visual acuity was 20/25, he had a full range of motion of both the upper and lower extremities, a full range of motion of both hips, but could not toe walk, had difficulty crouching and mild difficulty getting on and off the table (AR 220). Dr. Kalata's impressions were, *inter alia,* diabetes mellitus, status post left hip fracture, ambulatory dysfunction, a history of alcoholism and diminished visual acuity (AR 220).

Dr. Kalata assessed Plaintiff's ability to perform work-related physical activities (AR 222-223). Due to his left hip dysfunction, he opined that Plaintiff could lift and carry two to three pounds frequently and ten pounds occasionally; stand and/or walk for one hour or less; had no sitting limitations; and was limited in his pushing and pulling ability with his lower extremities (AR 222). Dr. Kalata further opined that he could occasionally bend, but never

kneel, stoop, crouch, balance or climb (AR 223). He had limitations with respect to seeing and hearing and had some environmental restrictions (AR 223).

Plaintiff returned to Dr. LaRochelle in December 2005 and reported that he felt tired (AR 239; 340). Plaintiff admitted that he was non-compliant with his diet and rarely monitored his blood sugar level (AR 239). It was noted that his blood sugar levels fluctuated and his Lantus dosage was increased (AR 239).

When seen by Dr. McLaughlin in February 2006, he observed that Plaintiff had "no significant antalgic gait" and was "walking very well" (AR 310). He denied any diabetic associated symptoms, and physical examination was normal, with the Plaintiff exhibiting 5/5 muscle strength in both his upper and lower extremities (AR 310). He was assessed with diabetes and his medications were refilled (AR 310).

In March 2006, Dr. LaRochelle noted that Plaintiff was mostly following his diet at that time and was checking his blood sugar regularly (AR 337). No complications from his diabetes were noted and his medications were adjusted (AR 337).

Plaintiff underwent a second consultative evaluation on March 16, 2006 conducted by Khanh Vu, D.O. (AR 282-290). Plaintiff reported that he was applying for disability due to a "bad left hip" (AR 282). He claimed that he broke his hip while on the job in 2002 (AR 282). He indicated that he saw a chiropractor for the injury, but due to the location of the fracture no treatment was needed (AR 282). He denied undergoing physical therapy and was not referred to an orthopedic specialist (AR 282). He further reported he was under medical care for diabetes (AR 282). Plaintiff informed Dr. Vu that he although he limped as a result of his bad hip, he did not use a cane and was able to walk anywhere he needed to go, including the mall, grocery store and Wal-Mart (AR 284). Plaintiff denied any vision abnormalities or suffering from any gastrointestinal problems (AR 283).

Physical examination of his back and spine were normal and he exhibited full muscle strength in his arms at 5/5 and his grip strength was 100% (AR 284). Dr. Vu found he had full range of motion of the lower extremities and mild left hip tenderness, but was able to balance on either leg and maintain a functional gait (AR 284). An x-ray of the Plaintiff's left hip revealed no fracture or dislocation (AR 286). Dr. Vu stated that overall, Plaintiff was "very much intact"

and not "functionally impaired" (AR 285).

In his assessment of the Plaintiff's work-related functional abilities, Dr. Vu opined that he could lift up to 50 pounds occasionally and had no limitations in his ability to sit, stand or walk, was unlimited in his pushing and pulling abilities, and had no other limitations (AR 287-288).

In addition to the two consultative evaluations, Marci Probst, and state agency reviewing examiner, reviewed the evidence of record and concluded in both 2005 and 2006 that the Plaintiff could perform light work, which included lifting twenty pounds occasionally, standing and walking for at least two hours in an eight-hour workday, and sitting for at least six hours in an eight-hour workday (AR 228-233; 292-295).

Throughout the remaining months of 2006, follow up visits with Dr. McLaughlin and Dr. LaRochelle demonstrated that Plaintiff's diabetes control fluctuated and that he rarely checked his blood sugar levels. In June 2006, Dr. LaRochelle reported no diabetic complications and continued Plaintiff's medication regimen (AR 334). In August 2006 she reported he was "doing well" with no complaints, his physical examination was essentially normal with no musculoskeletal complaints noted and his diabetes was under good control (AR 332).

Plaintiff was seen by Dr. McLaughlin in February 2007 who noted he was "doing well" although he complained of back and neck pain (AR 304). He had no other complaints and his physical examination was normal (AR 304). In March 2007 Dr. LaRochelle reported that the Plaintiff's blood sugar readings had been good and no diabetic complications were noted (AR 327). In June 2007 Plaintiff was seen by Sally Soffa, CRNP at Northwest Physicians Associates, who found that his diabetes had worsened but his physical examination was unremarkable (AR 325-326). When seen by a podiatrist he reported that his feet were cracking but denied any other diabetic complications and he had no musculoskeletal complaints (AR 357-358). Physical examination was normal except for some decreased sensation over the first great toe (AR 358). He was diagnosed with uncomplicated diabetes (AR 358). Finally, Plaintiff was seen by Dr. Adsit in July 2007 who documented very little clinical findings (AR 3120313).

Plaintiff and Mary Beth Kopar, a vocational expert, testified at the administrative hearing held by the ALJ on September 13, 2007 (AR 365-407). Plaintiff testified that he had not worked since May 4, 2001, with the exception of one month in 2003 (AR 327-373). He claimed he was a

"retired alcoholic" and had been sober since 2004 (AR 376). Plaintiff testified that he did not use an assistive device to walk, but limped due to left hip pain (AR 378). He indicated that he started having hip pain in 2004 and denied undergoing surgery or physical therapy (AR 378). He also claimed he suffered from back pain (AR 379-380).

Plaintiff testified that his diabetes was currently under control and that he regularly monitored his blood sugar levels (AR 382-383). He stated that he suffered from blurriness "once in a while" in both eyes and was recently diagnosed with glaucoma for which he was prescribed eye drops (AR 383). He indicated that he had tingling cramps in his legs and feet and had been instructed by his doctor to elevate his feet (AR 389). He further indicated that when his blood sugar was elevated he experienced dizziness (AR 393). Plaintiff claimed he could only walk for half a block before needing to sit down, stand for approximately fifteen to twenty minutes, sit for fifteen to twenty minutes at a time and lift up to twenty five pounds, but not repeatedly (AR 384-386; 395). He was able to care for his personal needs and perform some routine chores with some degree of difficulty (AR 386-387).

The vocational expert testified that the Plaintiff's past relevant work experience was at the medium exertional level and classified as semi-skilled work (AR 395). The ALJ then asked the vocational expert if work existed for an individual of Plaintiff's age, education, and work history, who was able to perform work that did not require exertion above the light level with no repetitive operation of foot controls, and no climbing, crawling, kneeling or balancing, and no exposed heights or diminished lights (AR 397). The vocational expert testified that the Plaintiff's past work skills were transferable to semi-skilled work, and that such an individual could perform the semi-skilled light jobs of a press operator/rubber mold maker, tool collector, order caller and ticket taker (AR 397-401).

Following the hearing, the ALJ issued a written decision which found that the Plaintiff was not entitled to a period of disability or disability insurance under the Act (AR 20-43). His request for review by the Appeals Council was denied (AR 6-12) and he subsequently filed this action.

## II. Standard of Review

The Court must affirm the determination of the Commissioner unless it is not supported

by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[2] The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. Here, the ALJ found that, from January 2004, the Plaintiff's diabetes mellitus, residuals of hip injury and back pain were severe impairments, but determined at step

---

[2]In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Plaintiff satisfied the insured status requirements of the Act through March 31, 2007 (AR 22).

three that he did not meet a listing (AR 25-27).[3] The ALJ determined that Plaintiff had the residual functional capacity to perform light work[4] with no repetitive use of foot controls, climbing, crawling, kneeling or balancing, and could not perform work at exposed heights or in a diminished light environment (AR 27). He concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 42). In addition, the ALJ found that the Plaintiff's statements concerning the intensity, persistency and limiting effects of his symptoms caused by his impairments were not entirely credible (AR 39). Again, this determination must be affirmed unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff challenges the ALJ's finding that he can perform light work with certain restrictions. In determining an individual's residual functional capacity, an ALJ must consider all relevant evidence. *See* 20 C.F.R. § 404.1545(a); *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000). "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett,* 220 F.3d at 121, quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20

---

[3]Although the Plaintiff alleged an onset date of May 4, 2001, the ALJ found that the medical evidence failed to establish the existence of a severe impairment prior to January 2004 (AR 22-25). The ALJ further found that the Plaintiff's GERD was not severe (AR 25). Plaintiff does not challenge these findings.

[4]Light work is defined in the regulations as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). Social Security Ruling ("*SSR*") 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*SSR* 96-5p (1996), 1996 WL 374183 *5. Plaintiff contends that the ALJ erred in his evaluation of the medical evidence. *See* Plaintiff's Brief pp. 10-11. Specifically, the Plaintiff argues that the ALJ erred in his determination relative to his RFC based upon the ALJ's alleged failure to have properly evaluated and weighed the opinions of the various medical providers.

An ALJ has an obligation to consider all of the medical evidence in the record. *See Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999). Absent a controlling opinion of a treating physician, he has a great deal of discretion in determining what weight to accord to that evidence. *See* 20 C.F.R. § 404.1527(d). He may choose between contradictory medical opinions or reject a medical opinion that is contradicted by other evidence of record. *See Plummer*, 186 F.3d at 429; *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). ALJ may not, however, set his own expertise "against that of a physician who presents competent medical evidence." *Plummer*, 186 F.3d at 429; *see also Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985). He "may not make speculative inferences from medical reports[,]" *Plummer*, 186 F.3d at 429, and he may not substitute his own personal reaction to the claimant's responses or physical appearance for that of an examining physician or psychologist. *See Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). Finally, the ALJ may not summarily reject medical evidence; he must articulate in writing his reasons for discounting it. *See Plummer*, 186 F.3d at 429; *Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

With respect to the Plaintiff's musculoskeletal complaints, the ALJ observed that Plaintiff's medical records from various treating physicians revealed that his physical examinations were consistently normal with no musculoskeletal abnormalities reported (AR 27-

37). As further noted by the ALJ, diagnostic studies of the Plaintiff's hip revealed no evidence of a hip fracture, and Dr. Caldwell reported that his station and gait were normal and he did not use an assistive device for ambulation (AR 31). He accorded great weight to the objective clinical findings of Dr. Vu, the consulting examiner, who found that the Plaintiff exhibited full muscle strength in his arms, had full range of motion throughout and the ability to maintain a functional gait (AR 35). He found that Dr. Vu's findings were "very consistent" with the medical evidence in the record (AR 40). Regarding his diabetes, the ALJ observed that there was an absence of significant diabetic clinical findings in support of the Plaintiff's claimed inability to work (AR 27-37). He recognized that the Plaintiff's diabetes was at times uncontrolled, but that the medical records revealed this was due to Plaintiff's noncompliance with treatment (AR 27-37). Similarly, while the Plaintiff had some eye difficulties, his physical examinations were largely insignificant (AR 27-37). The ALJ noticed the absence of an opinion from a treating physician regarding his ability to work, or imposing any functional limitations (AR 40). Finally, the ALJ relied, in part, on the state agency adjudicator's assessments that the Plaintiff could perform light work (AR 41). I find that the ALJ's findings cited above were supported by substantial evidence and his analytical approach was consistent with the above cited case law.

Plaintiff challenges that ALJ's decision to accord little weight to the opinion of Dr. Kalata, the consultative examiner who evaluated the Plaintiff pursuant to the request of the Commissioner. Dr. Kalata opined that Plaintiff was limited sedentary work with some restrictions (AR 222-223). Plaintiff claims that the ALJ "ignored" this RFC assessment without citation to contrary medical evidence. *See* Plaintiff's Brief p. 11.

I first note that the treating physician rule does not apply to a consulting physician's opinion. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3rd Cir. 1993) (doctrine had no application to physician who examined claimant once). The Commissioner's regulations do provide, however, that the ALJ must consider the extent to which the opinion is supported by a logical explanation, the degree of the medical source's specialization in a relevant field, and the extent to which the source's opinion is consistent with the entirety of the evidence. *See generally* 20 C.F.R. § 404.1527(d)(1)-(6).

The ALJ evaluated Dr. Kalata's opinion consistent with the above standards. The ALJ

noted that Dr. Kalata's diagnosis of a left hip fracture/dysfunction, as well as the resultant functional assessment, was not supported by any objective clinical or diagnostic medical evidence in the record, other than the Plaintiff's performance at the consultative examination (AR 33). He concluded that his findings were unique within the longitudinal view of the medical evidence and "very inconsistent" with other substantial evidence in the record (AR 40). Specifically, he noted that Dr. Kalata's findings were inconsistent with the findings documented by the various treating physicians, including Dr. Caldwell, the notes from Conneaut Valley and Dr. LaRochelle (AR 40). Consequently, the ALJ accorded his functional capacity assessment little weight (AR 34). I find that the ALJ's conclusions in this regard were supported by substantial evidence.

Plaintiff contends that the ALJ placed improper emphasis on the fact that none of his treating physicians placed any kind of restriction on his functional abilities or opined as to whether he was disabled. *See* Plaintiff's Brief pp. 11-12. However, in construing the administrative record, an ALJ may rely on what the record does *not* say, as well as what it does say. *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2nd Cir. 1983) (citations omitted). Here, the record is conspicuously devoid of any medical evidence demonstrating the Plaintiff's impairments resulted in physical limitations apart from those credited by the ALJ. *See Lane v. Commissioner of Soc. Sec.*, 100 Fed. Appx. 90, 95 (3rd Cir. 2004) (unpublished opinion) (noting that none of the claimant's treating physicians opined that she was unable to work or had any work related functional limitations and this lack of medical evidence was "very strong" evidence that claimant not disabled).

Plaintiff further argues that the ALJ's decision demonstrates that the record was incomplete and he should have contacted his treating physicians to obtain such opinions. Section 404.1512(e)(1) provides that the Administration will take action to re-contact medical sources and obtain additional medical information where the existing evidence is insufficient to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1512(e)(1). Here, I find that the record was sufficiently developed and that the ALJ did not err in failing to contact the Plaintiff's treating sources.

Plaintiff next contends that the hypothetical posed by the ALJ to the vocational expert

does not accurately reflect his functional limitations and therefore the ALJ cannot rely upon the vocational expert's testimony. The law is well established that "[w]hile the ALJ may proffer a variety of assumptions to [a vocational] expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3rd Cir. 1984). In other words, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987), *citing, Podedworny, supra*. *See also Wallace v. Secretary of Health and Human Services*, 722 F.2d 1150 (3rd Cir. 1983). Since the ALJ's determination relative to the Plaintiff's RFC was supported by substantial evidence, I find no error in the hypothetical posed to the vocational expert.

Finally, I reject the Plaintiff's argument that the ALJ should have found him disabled pursuant to Rules 202.01 and 202.06 of the Medical-Vocational Guidelines (the "Grids"). *See* Plaintiff's Brief p. 12. The Grids were promulgated in order to establish the types and number of jobs that exist in the national economy based upon a claimant's vocational factors (age, education and work experience) and exertional RFC (sedentary, light, medium, heavy or very heavy) and direct conclusions of "disabled" or "not disabled." *See* 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a); *Sykes v. Apfel*, 228 F.3d 259, 263 (3rd Cir. 2000); *Santise v. Schweiker*, 676 F.2d 925, 928 (3d Cir. 1982). In order to mechanically apply a Grid rule to direct a decision of "disabled" or "not disabled" however, the claimant's RFC, age, education and work experience must coincide exactly with those in the rule. *See Mason v. Shalala,* 994 F.2d 1058, 1064 (3rd Cir. 1993); *Santise*, 676 F.2d at 928; Social Security Ruling ("SSR") 83-11, 1983 WL 31252, at 2. However, where the evidence demonstrates the existence of nonexertional limitations, the Grids may not automatically be used to establish that there are jobs the claimant can perform; but rather, are used as a framework for the ALJ's decision. *See Martin v. Barnhart*, 240 Fed. Appx. 941, 944 (3rd Cir. 2007) (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a)).

Here, as the Commissioner points out, the ALJ concluded that the Plaintiff had nonexertional limitations that precluded him from performing the full range of light work (AR

41-42).[5] Consistent with the regulations, the ALJ consulted the Grids as a framework for decisionmaking, specifically considering Rules 202.12 and 202.07, and noted that both rules directed a finding of "not disabled" (AR 42).[6] However, the ALJ recognized that he could not mechanically apply the Grids, and appropriately sought the testimony of a vocational expert in order to clarify the Plaintiff's potential occupational base (AR 42). Based upon the vocational expert's testimony, the ALJ concluded that there were jobs in the national economy that the Plaintiff could perform.

In arguing that a finding of disability is mandated, the Plaintiff refers the Court to Rules 202.01 and 202.06, which he contends "require" a finding of disability in this case. *See* Plaintiff's Brief p. 12. These Rules, however, do not apply to the Plaintiff's vocational profile as found by the ALJ. Rule 202.01 applies to individuals of "advanced age" with a limited education and an unskilled work history. *See* 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.01. It is undisputed that the Plaintiff did not attain the advanced age of 55 until after his date last insured and that his past jobs were semi-skilled in nature (AR 42). Similarly, Rule 202.06 applies to high school graduates of "advanced age" with a skilled or semi-skilled work history that is not transferable. *See* 20 C.F.R. pt. 404, subpt. P, app. 2 Rule 202.06. Plaintiff is not a high school graduate, and the vocational expert testified that his skills were transferable. In light of the ALJ's undisputed findings with regard to the Plaintiff's age, education and previous work background, I find no error in the ALJ's consideration of the Grids.

## IV. CONCLUSION

An appropriate Order follows.

---

[5]Nonexertional limitations include postural limitations, such as restrictions on climbing or crouching, as well as environmental restrictions. *See* 20 C.F.R. § 404.1569a(c)(1)(v) and (vi).

[6]The reference to Rule 202.07 appears to be a typographical error since Rule 202.03 fits the Plaintiff's vocational profile identified by the ALJ in his decision. In any event, both rules dictate a finding of "not disabled." See 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 202.03; 202.07.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GEORGE R. SCHNEIDER, )
)
Plaintiff, )
) Civil Action No. 08-256 Erie
)
v. )
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
Defendant. )

**ORDER**

AND NOW, this 24th day of November, 2009, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 10] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, George R. Schneider.

The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.